[70 NE3d 936, 48 NYS3d 269]

FLO & EDDIE, INC., a California Corporation, Individually and on Behalf of All Others Similarly Situated, Respondent, v SIRIUS XM RADIO, INC., a Delaware Corporation, Appellant, et al., Defendants.

Argued October 18, 2016; decided December 20, 2016

584

**POINTS OF COUNSEL**

*O'Melveny & Myers LLP*, Washington, D.C. (*Jonathan D. Hacker*, of the District of Columbia bar, admitted pro hac vice, of counsel), *O'Melveny & Myers LLP*, Los Angeles, California (*Daniel M. Petrocelli*, of the California bar, admitted pro hac vice, and *Cassandra L. Seto*, of the California bar, admitted pro hac vice, of counsel), and *O'Melveny & Myers LLP*, New York City (*Anton Metlitsky* of counsel), for appellant.

*Gibson, Dunn & Crutcher LLP*, New York City (*Caitlin J. Halligan, Ester Murdukhayeva* and *Kathryn M. Cherry* of counsel), and *Gradstein & Marzano, P.C.*, Los Angeles, California (*Henry Gradstein*, of the California bar, admitted pro hac vice, *Maryann R. Marzano*, of the California bar, admitted pro hac vice, and *Daniel B. Lifschitz*, of the California bar, admitted pro hac vice, of counsel), for respondent.

*Mitchell L. Stoltz, Electronic Frontier Foundation*, San Francisco, California, for Electronic Frontier Foundation, amicus curiae.

*Jenner & Block LLP*, Washington, D.C. (*Kenneth L. Doroshow* and *Devi M. Rao* of counsel), and *George M. Borkowski, Recording Industry Association of America, Inc.*, Washington, D.C., for Recording Industry Association of America, Inc., amicus curiae.

*Paul Hastings LLP*, Washington, D.C. (*Stephen B. Kinnaird* of counsel), and *Rick Kaplan* and *Suzanne Head, National Association of Broadcasters*, Washington, D.C., for National Association of Broadcasters, amicus curiae.

*Wilson, Elser, Moskowitz, Edelman & Dicker LLP*, New York City (*Adam R. Bialek, Stephen J. Barrett* and *Kerianne Losier* of counsel), and *David L. Donovan, New York State Broadcasters Association, Inc.*, Albany, for New York State Broadcasters Association, Inc., amicus curiae.

*Hartman & Winnicki, P.C.*, Ridgewood, New Jersey (*Daniel L. Schmutter* of counsel), for Howard B. Abrams and others, amici curiae.

*King & Spalding LLP*, San Francisco, California (*Joseph R. Wetzel* and *Ethan P. Davis* of counsel), for Association for Recorded Sound Collections, amicus curiae.

*Irell & Manella, LLP*, Los Angeles, California (*Robert M. Schwartz* and *Victor Jih* of counsel), and *Kelley Drye & Warren LLP*, New York City (*Michael Lynch* and *James Saylor* of counsel), for CBS Radio, Inc., amicus curiae.

*Weil, Gotshal & Manges LLP*, New York City (*Benjamin E. Marks, Gregory Silbert* and *Kami Lizarraga* of counsel), *Latham & Watkins LLP*, San Francisco, California (*James K. Lynch* and *Andrew M. Gass* of counsel), and *Latham & Watkins LLP*, Washington, D.C. (*Jonathan Y. Ellis* of counsel), for Pandora Media, Inc. and others, amici curiae.

*Raza Panjwani, Public Knowledge*, Washington, D.C., for Public Knowledge, amicus curiae.

## OPINION OF THE COURT

STEIN, J.

The Second Circuit Court of Appeals has certified the following question to this Court: "Is there a right of public performance for creators of sound recordings under New York law and, if so, what is the nature and scope of that right?" Because New York common-law copyright does not recognize a right of public performance for creators of sound recordings, we answer the certified question in the negative.

### I.

### Procedural History

Plaintiff is a corporation owned by two of the original members of the Turtles, a band formed in 1965 and most famous for its No. 1 hit song "Happy Together." Plaintiff controls the master recordings of approximately 100 Turtles songs that were recorded before 1972. Defendant is the nation's

largest satellite digital radio service. Defendant acknowledges that it broadcasts pre-1972 sound recordings, including Turtles songs, but does not have licenses with the performers or the sound recording copyright holders, nor does it pay them for broadcasts. Plaintiff commenced this federal putative class action, on behalf of recording artists of pre-1972 sound recordings—or the owners of their rights, who are mostly record companies—alleging common-law copyright infringement and unfair competition. Defendant moved for summary judgment dismissing the complaint.

The United States District Court for the Southern District of New York denied defendant's motion for summary judgment, finding, among other things, that New York affords a common-law right of public performance to protect copyright holders of pre-1972 sound recordings, and that defendant's conduct in making internal reproductions of plaintiff's recordings to facilitate its broadcasts did not constitute fair use (62 F Supp 3d 325 [SD NY 2014]). The District Court indicated that it intended to grant plaintiff summary judgment on liability. That court later denied defendant's motion for reconsideration (113 USPQ2d 1303, 2014 WL 7178134, 2014 US Dist LEXIS 174907 [SD NY, Dec. 12, 2014, No. 13 Civ 5784(CM)]), but certified an interlocutory appeal.

On defendant's appeal, the Second Circuit Court of Appeals determined that the case presented "a significant and unresolved issue of New York copyright law," and certified the foregoing question to this Court (821 F3d 265, 267, 272 [2d Cir 2016]).[1] This Court accepted the certified question (27 NY3d 1015 [2016]).

## II.

### Federal Copyright Law

Although copyright evolved in English common law and was adapted into the common law in this country, it is now primarily governed by federal statutes. Congress enacted the first federal Copyright Act in 1790 (see Act of May 31, 1790 § 1 [1st Cong, 2d Sess, ch 15], 1 US Stat 124, reprinted in Lib of Cong,

---

**1.** Although the Second Circuit held that defendant copied plaintiff's sound recordings in the course of its broadcasting protocol, the court deferred resolution of the fair use defense, unfair competition, and other issues raised, until after we answer its certified question (821 F3d 265, 270 n 4, 272 [2d Cir 2016]).

Copyright Enactments, 1783-1900 at 30-32); however, federal law did not protect musical works until 1831 (*see* Copyright Act of 1831 [21st Cong, 2d Sess, ch 16], 4 US Stat 436). Despite a major revision of the Copyright Act in 1909, Congress did not consider audio musical works or recordings—as contrasted with the musical composition (sheet music)—to be within the scope of the act (*see Capitol Records, Inc. v Naxos of Am., Inc.*, 4 NY3d 540, 552 [2005]). This is unsurprising, considering that sound recording was, at that time, a relatively new technology.[2] State common law applies to copyright only to the extent that federal statutes do not (*see* 17 USC § 301 [a]; *Naxos*, 4 NY3d at 559). Pursuant to federal statute, copyright protection encompasses original works of authorship fixed in any tangible medium of expression, including the categories of literary works, musical works, dramatic works and, as relevant here, sound recordings, subject to certain limitations (*see* 17 USC § 102 [a]).

Sound recordings were a late addition to the federal statutes. They were first included in the Sound Recording Amendment of 1971, but the protection afforded by the amendment was limited to those recordings produced after February 15, 1972 (*see* Pub L 92-140, 85 US Stat 391 [1971]). The federal statutes then provided exclusive rights to the owner of a copyright to reproduce the work in copies or phonorecords, prepare derivative works, and distribute copies of the work to the public by sale or lease (*see* 17 USC § 106 [1]-[3]; *Arista Records, LLC v Launch Media, Inc.*, 578 F3d 148, 152 [2d Cir 2009] [noting the right to reproduce "tangible" copies of sound recordings], *cert denied* 559 US 929 [2010]). Although the statutes provided a right "to perform the copyrighted work publicly," that right applied only to literary, musical, dramatic, and choreographic works, motion pictures, pantomimes and other audiovisual works; Congress expressly stated that this performance right did not extend to sound recordings (*see* 17 USC §§ 106 [4]; 114 [a] [providing that the exclusive rights of owners of sound recordings were limited and did not include any right of performance]; *Arista Records, LLC*, 578 F3d at 152).

A summary of the historical background of the distinction between the law's treatment of composers versus performers was articulated in *Bonneville Intl. Corp. v Peters*, as follows:

---

2. The phonograph was invented in 1877.

"The creator of a musical composition has long had a right of exclusive public performance of that musical piece. . . . However, the owner of a copyright in a *sound recording* of a musical composition has long had very little copyright protection. Until 1971 there was no copyright protection at all. With the Sound Recording Amendment of 1971, a limited copyright in the reproduction of sound recordings was established in an effort to combat recording piracy. However, there was still no right to public performance of that sound recording. Therefore, while playing a compact disc recording of [a particular song] in a concert hall for the paying public would still enrich [the composer's assignee], the person or company that owned the copyright *on the CD recording* of the music would earn no remuneration beyond the proceeds from the original sale of the recording. . . . While radio stations routinely pay copyright royalties to songwriters and composers (through associations like the American Society of Composers, Authors, and Publishers . . . ('ASCAP') and Broadcast Music, Inc. ('BMI')) for the privilege of broadcasting recorded performances of popular music, they do not pay the *recording industry* royalties for that same privilege. Perhaps surprisingly, this state of affairs, until [the early 1990s], produced relatively high levels of contentment for all parties. The recording industry and broadcasters existed in a sort of symbiotic relationship wherein the recording industry recognized that radio airplay was free advertising that lured consumers to retail stores where they would purchase recordings. And in return, the broadcasters paid no fees, licensing or otherwise, to the recording industry for the performance of those recordings. The recording industry had repeatedly sought, however, additional copyright protection in the form of a performance copyright. Until 1995, those efforts were rejected by Congress" (347 F3d 485, 487-488 [3d Cir 2003] [citations and footnotes omitted and some emphasis added]).

In 1995, due to concerns about the expansion of digital means of reproducing music, Congress enacted the Digital Performance Right in Sound Recordings Act (DPRA), which accorded sound recording owners a right to control or authorize the

public performance of the copyrighted work, but only for performances "by means of a digital audio transmission" (17 USC § 106 [6]). At the same time, however, Congress fashioned a number of exemptions to this right. Thus, under federal law, the exclusive right of performance is circumscribed, and excludes transmissions in nonsubscription broadcasts, as well as the playing of music within a business establishment and its surrounding vicinity (*see* 17 USC § 114 [d]).

Essentially, the right to control performance is now limited to digital radio services, and does not apply to AM/FM radio stations, nor to bars, restaurants or stores that play music in their establishments. "This exemption was founded in Congress's desire not to impose 'new and unreasonable burdens on radio and television broadcasters, which often promote, and appear to pose no threat to, the distribution of sound recordings' " (*Bonneville Intl. Corp.*, 347 F3d at 488, quoting HR Rep 104-274, 104th Cong, 1st Sess at 14 [1995]).

Significantly, the DPRA created a highly complex scheme that: established a statutory licensing regime for noninteractive digital subscription services; required copyright owners to grant a license to such services for performance of their sound recordings (in order to prevent an artist from refusing to allow digital radio play); provided a means of determining reasonable rates and royalty payments (including a dispute resolution system); and required that portions of the royalties be distributed to the recording artists, as well as to the copyright owner (*see* 17 USC § 114 [d], [e], [f], [g]; *Bonneville Intl. Corp.*, 347 F3d at 488-489). The enactment of the DPRA was prompted, in part, by concerns that, without appropriate protection, the creation of new sound recordings and musical works would be discouraged, and new subscription and interactive services might adversely affect sales of sound recordings and erode the ability of copyright owners to control and be paid for their work (*see Arista Records, LLC*, 578 F3d at 154). After years of public comment and deliberation, Congress attempted to strike a balance between, on the one hand, protecting owners of copyright and encouraging creation of new music and, on the other hand, promoting the development of new media and distribution forms (*see id.*). Indeed, through the DPRA's intricate scheme of rules and exceptions, Congress balanced the interests of numerous stakeholders, including digital radio services, recording companies, composers, terrestrial radio stations, businesses that play music on their premises, performing artists, and the public.

In the DPRA, Congress specifically provided that, while the federal copyright statutes preempted other laws, they did not limit or annul the common law or statutes of any state with respect to a violation of rights unless the rights provided under state law were equivalent to the exclusive rights contained in 17 USC § 106 (*see* 17 USC § 301 [b] [3]). With respect to sound recordings fixed before February 15, 1972, Congress expressly stated that any rights or remedies under state statutes or common law (that do not conflict with the federal statutes) may be applied until February 15, 2067 (*see* 17 USC § 301 [c]). In this regard, the United States Supreme Court has held that states can regulate—by statute or common law—areas of copyright not covered by federal statutes, including recordings of musical performances fixed prior to 1972 (*see Goldstein v California*, 412 US 546, 570-571 [1973] [upholding California anti-piracy statute applied to pre-1972 sound recordings]). While Congress permitted the states to regulate unaddressed areas of copyright law until 2067, it neither indicated that such rights existed, nor required states to recognize or create new or additional rights.

In a case addressing statutory copyright, the Supreme Court explained that, while copyright is a form of property interest, it is not like ordinary chattels insofar as it "comprises a series of carefully defined and carefully delimited interests to which the law affords correspondingly exact protections" (*Dowling v United States*, 473 US 207, 216 [1985]). Consistent with that principle, 17 USC § 106 confers certain exclusive rights, including the right to publish, copy and distribute the work, but the copyright owner is subjected to defined limits and is not accorded "complete control over all possible uses of his [or her] work" (*id.* at 217 [internal quotation marks and citations omitted]).

## III.

### New York State Common-Law Copyright

The question now before us is whether, in light of this history, New York common law includes a right to control public performances of pre-1972 copyrighted sound recordings. If so, the copyright holders have gone decades without acting to enforce that right.

The common law, of course, evolves slowly and incrementally, eschewing sudden or sweeping changes (*see Norcon Power*

*Partners v Niagara Mohawk Power Corp.*, 92 NY2d 458, 467-468 [1998]). We have recognized that the legislature has the ability to step in and make drastic changes to the law, but that courts cannot do so (*see Roberson v Rochester Folding Box Co.*, 171 NY 538, 545 [1902]). Rather, when addressing a legal question for the first time, courts must be mindful of the effect on future litigation and the development of the law (*see id.* at 545-547). State court cases in New York have not directly addressed the question of whether the common-law copyright for sound recordings includes the right of public performance. Thus, this issue of first impression requires a review of our state's relevant case law.

*Palmer v De Witt* (47 NY 532 [1872]) was an early case concerning common-law copyright of a play. In that case, this Court explained that authors have a common-law copyright—also called the right of first publication—in unpublished works of any form, including literary works, dramatic or musical compositions, designs or artwork. In accordance with such right, the author may determine whether to publish the work at all and, if so, "when, where, by whom, and in what form" (*id.* at 536). That exclusive right was limited to the first publication such that, under common law, once the work was published and dedicated to the public, it became the property of the world, and the author had no exclusive right to make multiple copies or control whether others could make and distribute copies (*see id.* at 536, 539). Nevertheless, while we did not recognize a common-law right to control distribution after the first publication, authors obtained a statutory right to multiply copies to the exclusion of others (*see id.* at 536; *see also A. J. Sandy, Inc. v Junior City*, 17 AD2d 407, 409 [1st Dept 1962]). In other words, in *Palmer*, this Court described the protection of literary labor as primarily statutory in nature and concluded that the common-law protection was "very slight at the best" (*Palmer*, 47 NY at 539).

The question then became whether the dramatic composition at issue in *Palmer* had been "published" by being performed on stage with the author's permission, even though the script, itself, had not been distributed to the public. In that regard, we explained that "[t]he rights of an author of a drama in his [or her] composition are two-fold. He [or she] is entitled to the profit arising from its performance, and also from the sale of the manuscript, or the printing and publishing [of] it" (*id.* at 543). Those rights—performance; and printing and distribu-

tion—were described as entirely distinct, it being possible for one to exist without the other (*see id.* at 542). We noted that the exclusive right of first publication existed at common law, but that the right to control public performance was created by statute; in fact, the common law permitted anyone to perform a play from memory or from a legally procured script, without paying royalties to perform it (*see id.*). *Palmer* was an early example of the principle that a copyright owner can have separate rights addressing copying and performing, with the former based in common law and the latter based in statute. We did not recognize a single, inseparable bundle of rights.

Seventy years later, in *Pushman v New York Graphic Socy.*, this Court recognized that an artist has a common-law copyright—which we alternately called "control of the right to reproduce"—that protects the right to make reproductions of a painting, which right is separate from, and does not necessarily pass with, the sale of the painting (287 NY 302, 307 [1942]). That case similarly drew a distinction between the right to make copies and the right to the physical object itself, at times giving protection to one but not the other.

An important federal case in this discussion, decided a few years before *Pushman*, is *RCA Mfg. Co. v Whiteman* (114 F2d 86 [2d Cir 1940], *certs denied* 311 US 712 [1940]). Defendant contends that *Whiteman* definitively held that New York's common law does not provide a right of public performance to a copyright owner of a sound recording. Defendant maintains that, for the nearly 75 years between that decision in 1940 and the District Court's decision in the present case, all interested stakeholders treated *Whiteman* as a proper statement of New York law. In *Whiteman*, RCA had a contract pursuant to which it recorded Whiteman's orchestra and sold the records to the public, with a legend on each record stating that it was not licensed for radio broadcast (*see id.* at 87). The defendant broadcasting company purchased the records and then broadcast them on the radio. The Second Circuit considered the questions of whether Whiteman and RCA had any common-law property rights in the recordings that were invaded by such broadcasting and, if so, whether the legend limited the use that buyers might make of the records (*see id.*). The court began its analysis by noting that, although rights in sound recordings had been recognized only fairly recently—because it had been possible to record an artist's performance only since the advent of the phonographic record—such rights had nevertheless

become valuable (*see id.* at 88). The court ultimately held that "the 'common-law property' in these performances ended with the sale of the records and that the restriction did not save it" (*id.*).

That holding is based, in part, on the premise that any form of copyright "is a monopoly [that] consists only in the power to prevent others from *reproducing* the copyrighted work" (*id.* [emphasis added]). The court concluded that the broadcaster did not invade that right, because it never copied the performances; the broadcaster "merely used those copies which [Whiteman and RCA] made and distributed," in the way that the performances were intended to be used—namely, by playing them (*id.*). Addressing publication of the work, the court then applied that premise to conclude, consistent with the old common-law copyright rule, that the copyright was extinguished once a work was published (*see id.* at 89). The court stated that, if the common-law copyright had dissolved, "then anyone may copy it who chances to hear it, and may use it as he [or she] pleases. It would be the height of 'unreasonableness' to forbid any uses to the owner of the record which were open to anyone who might choose to copy the rendition from the record" (*id.*).

Fifteen years later, in *Capitol Records v Mercury Records Corp.* (221 F2d 657 [2d Cir 1955]), the Second Circuit again addressed the topic, including the *Whiteman* decision. At that time, a sound recording itself—as opposed to the musical composition—was not a copyrightable work under the federal statutes. Finding "a complete dearth of authority" in New York state law, the court premised its decision upon principle (*id.* at 662). As relevant here, the court addressed the question of whether the owner of the right to make certain sound recordings lost that right as soon as it sold its first records (*see id.* at 663). The court summarized *Whiteman* as holding that "the commonlaw property in the performances of musical artists which had been recorded ended with the sale of the records and that thereafter anyone might copy them and use them as he [or she] pleased" (*id.*). The court then asserted, however, that "the quoted statement from [*Whiteman*] is not the law of the State of New York" (*id.*). Citing a state trial-level decision handed down after *Whiteman*, the Second Circuit concluded that, where the originator of "records of performances by musical artists puts those records on public sale, his [or her] act does not constitute a dedication of the right to copy and sell the records" (*id.*, citing *Metropolitan Opera Assn., Inc. v*

*Wagner-Nichols Recorder Corp.*, 199 Misc 786 [Sup Ct, NY County 1950], *affd* 279 App Div 632 [1st Dept 1951]).

In our view, *Mercury Records* overruled *Whiteman*'s holding, but not the underlying premise pronounced in that case. The holding of *Mercury Records*—that merely selling a record to the public does not divest the copyright holder of its exclusive interest in the right to copy and distribute the protected sound recording—constitutes protection against piracy, which all of the parties and amici here recognize as valid. However, *Mercury Records* did not address the underlying premise stated in *Whiteman*—that common-law copyright of sound recordings "consists only in the power to prevent others from *reproducing* the copyrighted work"; that limited right does not include control over other rights in the work, such as public perform-ance (*Whiteman*, 114 F2d at 88 [emphasis added]). Since the 1940s, the recording and broadcasting industries appear to have acted in conformity with that premise, as evidenced by the apparent absence of any attempt by sound recording copyright owners to assert control over the right of public per-formance.

In the *Metropolitan Opera* case (199 Misc 786), the Metropoli-tan Opera (the Met) entered into a contract with ABC for the exclusive right to broadcast its performances. The Met also entered into a contract with Columbia Records for the exclusive right to make and sell phonograph records of its performances, but reserved the right to approve all records before they were offered for sale (*see id.* at 789-790). The defendant recorded the ABC broadcast performances off the air, without permission, and used those recordings to produce records that it then sold to the public (*see id.* at 790). The principal claim in the action brought by the Met was for unfair competition, but the Met also argued that it and its assignees possessed protected property rights such that they could exclude others from mak-ing recordings. The court concluded that the production of an opera included creative elements that the law of copyright would recognize and protect against appropriation (*see id.* at 798). Specifically, the court concluded that, under the common law, the live performance of an opera on stage and the broadcast of it on the radio under an exclusive broadcasting contract was publication for only a limited purpose, which did not dissolve the Met's rights to that performance for other purposes (*see id.*, citing *Palmer*, 47 NY 532). The court noted the care exercised by the Met in limiting its grants by entering

into exclusive contracts and reserving the right to approve records before their release, which indicated "an attempt to retain effective control over the broadcasting and recording of its performances" (*Metropolitan Opera Assn.*, 199 Misc at 799).

As the Second Circuit correctly stated in *Mercury Records*, *Metropolitan Opera* held that an artist or creator of a performance can, under New York common law, prevent someone without permission from exploiting a performance by making a surreptitious recording of it, reproducing that recording and selling the copies, as the defendant did there (*see Mercury Records Corp.*, 221 F2d at 663). In our view, however, *Metropolitan Opera* is essentially limited to an anti-piracy determination. Most of the other state trial-level cases also concern piracy or the meaning of the word "publication" in the copyright arena (*see e.g. Capitol Records v Greatest Records*, 43 Misc 2d 878, 879 [Sup Ct, NY County 1964]; *Columbia Broadcasting Sys. v Documentaries Unlimited*, 42 Misc 2d 723, 724-725 [Sup Ct, NY County 1964]; *Brandon Films v Arjay Enters.*, 33 Misc 2d 794, 795 [Sup Ct, NY County 1962]; *Gieseking v Urania Records*, 17 Misc 2d 1034, 1035 [Sup Ct, NY County 1956]). None of those cases, including *Metropolitan Opera*, directly address the right of public performance.[3]

Several cases addressing New York common law cite the decision of the Pennsylvania Supreme Court in *Waring v WDAS Broadcasting Sta.* (327 Pa 433, 194 A 631 [1937]). There, an orchestra sued a radio station for broadcasting the orchestra's

---

**3.** Publication is an important concept in common-law copyright. Copyright originally applied only to written works and, as noted above, the act of publication generally divested the author of common-law rights (*see Capitol Records, Inc. v Naxos of Am., Inc.*, 4 NY3d 540, 551-552 [2005]; *Jewelers' Mercantile Agency v Jewelers' Weekly Publ. Co.*, 155 NY 241, 247 [1898]). Thus, the common-law copyright was sometimes referred to as the right of first publication (*see Pushman v New York Graphic Socy.*, 287 NY 302, 307 [1942]; *Palmer v De Witt*, 47 NY 532, 536 [1872]). We have recognized that, because copyright laws were originally created to protect the written word, courts have been confronted with challenges in attempting to apply those laws to new or different forms of communication or expression (*see Naxos*, 4 NY3d at 552). Indeed, several of the cases cited in the immediately-preceding text above, as well as many others, have addressed what constitutes a general publication of a sound recording, such as would commit the recording to the public domain and divest it of common-law copyright protection. Federal statutes define "publication," but the definition only applies to works falling within the statutes themselves; pre-1972 sound recordings are not covered (*see id.* at 557; 17 USC § 101). Despite this digression, publication is not at issue in our discussion of the certified question here.

records, despite a label on each record stating that it was not licensed for radio broadcast (*see* 327 Pa at 436-437, 194 A at 632-633). The radio station had appropriated and used the orchestra's efforts for the station's own profit, in competition with the orchestra itself, which performed live on the radio each week in exchange for a sizable sum (*see* 327 Pa at 452-453, 194 A at 640). The Pennsylvania Supreme Court reasoned in that case that the phonograph record, itself, was distinct and independent from the title to the artistic property contained on it (the orchestra's performance of a composition), and that use of the latter could be limited despite the sale of the record (*see* 327 Pa at 448, 194 A at 638). Accordingly, the court determined that equity would allow an injunction to protect against unfair competition (*see* 327 Pa at 449, 194 A at 638).

*Waring* has no direct bearing on whether New York common law recognizes a right of public performance of sound recordings. To the extent this 1937 out-of-state decision pronounced a public performance right for creators of sound recordings under Pennsylvania common law, we find this holding inapplicable in the context of New York state common-law copyright.

The most recent pronouncement from this Court on New York's common-law copyright came in the 2005 case of *Capitol Records, Inc. v Naxos of Am., Inc.* (4 NY3d 540 [2005]). There, we were presented with a certified question and sub-questions that we summarized as asking "whether there is common-law copyright protection in New York for sound recordings made prior to 1972" (*id.* at 544). The plaintiff recording company, Capitol Records, had recorded famous musicians in the 1930s and had contracts with the artists that permitted an absolute worldwide right to the performances, including the right to make and sell copies of the recordings to the public. The defendant conducted its own restoration of the original recordings and offered compact discs for sale in the United States, without obtaining a license. The complaint alleged common-law copyright infringement under New York law.

The *Naxos* decision included summaries of *Waring*, *Metropolitan Opera* and *Whiteman* (*see id.* at 553-554). Our synopsis of *Waring* was limited to stating that an artist's rights in records were protected by state common law, and that the sale of records with a limiting label did not constitute a publication that would divest the artist of common-law property rights, because the labels indicated a lack of intent to make the records com-

mon property (*see id.*). We observed that the Second Circuit had reconsidered its view of state common law after *Metropolitan Opera*, and referred to that court's announcement in *Mercury Records* "that the appropriate governing principle [under New York common law] was that 'where the originator . . . of records of performances by musical artists puts those records on public sale, his [or her] act does not constitute a dedication of the right to copy and sell the records' " (*Naxos*, 4 NY3d at 554, quoting *Mercury Records Corp.*, 221 F2d at 663). This, we stated, was consistent with the long-standing practice of the United States Copyright Office and "became the accepted view within the music recording industry" (*Naxos*, 4 NY3d at 555). Recognizing that these decisions appear to conflict with the traditional principle that a public sale of a literary work constituted a general publication that terminated a common-law copyright, such that any further copyright protection must be statutory, we pointed out the historical distinction in the treatment of literary and musical works (*see id.*).

Turning to the scope of common-law copyright protection in New York, this Court indicated in *Naxos* that both the judiciary and the state legislature intended to fill the void left by Congress to protect owners of sound recordings (*see id.* at 559 [citing Penal Law art 275, and Arts and Cultural Affairs Law § 31.01 as legislative efforts]). We recognized that the federal statutes had abrogated our state common-law protection of sound recordings in two respects: first, the common law does not cover any sound recordings fixed after February 15, 1972, because the federal statutes cover them; and second, any state common-law protection for pre-1972 sound recordings is not perpetual because a federal statute mandates that state rights will cease in 2067 (*see Naxos*, 4 NY3d at 560; *see also* 17 USC § 301 [c]). Thus, we concluded that the pre-1972 sound recordings at issue therein were entitled to copyright protection under New York common law until 2067 (*see Naxos*, 4 NY3d at 560).

Next, it was necessary for us to determine what constituted "publication" under the facts presented. We declared that "in the realm of sound recordings, it has been the law in this state for over 50 years that, in the absence of federal statutory protection, the public sale of a sound recording otherwise unprotected by statutory copyright does not constitute a publication sufficient to divest the owner of common-law copyright protection" (*id.*). We concluded that the musical

recordings therein were entitled to common-law copyright protection under our state law, regardless of whether they had entered the public domain in the country of origin, if the alleged infringement occurred in New York (*see id.* at 561-563).

In answering one of the sub-questions in *Naxos*, this Court delineated the elements of a cause of action alleging New York common-law copyright infringement: "(1) the existence of a valid copyright; and (2) unauthorized *reproduction* of the work protected by the copyright" (*id.* at 563 [emphasis added]). We referred to the second element as requiring "unauthorized copying and distribution" (*id.*); we did not include unauthorized performance as an alternative way of establishing that element. Indeed, our decision did not, in the context of rights under state common-law copyright, discuss public performance at all.

*Naxos* does not resolve the question presently before us. That, too, was an anti-piracy case; it reiterated that New York's common-law copyright protection would prevent the unauthorized copying and sale of records. However, *Naxos* did not address the right of public performance. Thus, our conclusion in *Naxos* that pre-1972 sound recordings are subject to some New York common-law copyright protection does not define the scope of that protection or stand for the proposition that there is a single aspect to that protection, as opposed to separate and distinct aspects of reproduction and performance.

While the cases discussed above are not directly on point, they do demonstrate that we can, and do, separate the various rights held by creators of sound recordings. *Palmer* recognized the two distinct rights of a play's author—the right to control copying and sales of scripts, and the right to control performances (*see* 47 NY at 543). These rights were described in a way that separated them for legal purposes. *Pushman* also discussed the separate nature of the artist's rights to sell a painting and to control the ability to make reproductions (*see* 287 NY at 307). Moreover, these distinct rights have been treated differently.

Most of the decisions from lower courts, or from federal courts applying New York law, have been rendered in anti-piracy cases that do not provide an answer or rationale to support a conclusion regarding the question presented here— whether New York common law provides a right of public performance to creators of sound recordings (*see Mercury Rec-*

*ords Corp.*, 221 F2d at 663; *Gieseking*, 17 Misc 2d at 1035; *Capitol Records v Greatest Records*, 43 Misc 2d at 879; *Metropolitan Opera*, 199 Misc at 799). Although *Whiteman* was overruled in part, *Mercury Records* should not be read to overrule the underlying premise—not at issue in the latter case—that our common-law copyright protection prevents only the unauthorized reproduction of the copyrighted work, but permits a purchaser to use copies of sound recordings for their intended purpose, namely, to play them (*see Whiteman*, 114 F2d at 88). It makes sense that, consistent with its name, *copy*right prevents *copying* of a work, but does not prevent someone from using a copy, once it has been lawfully procured, in any other way the purchaser sees fit.

## IV.

### Societal Expectations

The understanding and expectations of society are also relevant to the question of what falls within the common-law copyright protection (*see Motorola Credit Corp. v Standard Chartered Bank*, 24 NY3d 149, 162-163 [2014] [refusing to overrule long-standing common-law rule because interested parties in the affected segment of society had relied on the rule]; *Naxos*, 4 NY3d at 561 n 9 [observing that our conclusion regarding state common-law copyright was the same position taken by the United States Copyright Office and sound recording industry]). In that regard, at hearings held before Congress, representatives of the recording industry have indicated that copyright owners do *not* have a right of performance (*see e.g. Arista Records, LLC*, 578 F3d at 153 [citing 1995 testimony of Jason Berman, president of the Recording Industry Association of America, that without a copyright in right of performance via Internet technology, the industry would be unable to compete in the emerging digital age]; testimony of Jason S. Berman before the House Judiciary Subcommittee on Courts and Intellectual Property: Hearing on HR 1506, June 21, 1995, 1995 WL 371088 [stating that under existing law, performers "have no rights to authorize or be compensated for the broadcast or other public performance of their works"]; Copyright Law Revision: Hearings before the Subcommittee on the Judiciary, Part 2, 90th Cong, 1st Sess at 496, 500 [1967] [stating that under existing law the record companies and performers receive nothing from public performance on radio or in clubs]).

While plaintiff suggests that this testimony, and the lobbying of Congress by the recording industry for a right of public performance, merely reflected the understanding that there was no *federal statutory right* to public performance in sound recordings, many of the statements reflect a broader understanding that there was *no such right*—including under state common law—to protect copyright holders of sound recordings.[4] Indeed, several Registers of Copyrights have repeatedly indicated that no such public performance right exists, or at least that it was not generally recognized (*see* Copyright Office, Federal Copyright Protection for Pre-1972 Sound Recordings: A Report of the Register of Copyrights 44-45 [2011] [explaining that "(i)n general, state law does not appear to recognize a performance right in sound recordings"];[5] Performance Royalty: Hearings before the Subcommittee on Patents, Trademarks, and Copyrights of the Senate Committee on the Judiciary on S 1111, 94th Cong, 1st Sess at 10 [Comm Print 1975] [stating that creators of sound recordings have copyright protection under federal law, but "still receive no royalties whatever from the public performance for profit of their copyrighted works"]; Copyright Law Revision: Hearings before Subcommittee No. 3 of the House Committee on the Judiciary on HR 4347, HR 5680, HR 6831, HR 6835, 89th Cong, 1st Sess at 1863 [Comm Print 1965] [opining, based on experience, that the chance of enacting a bill recognizing a right of performance in sound recordings was so remote as to be nonexistent]). To be sure, the beliefs of these individuals and groups are not dispositive; however, they do shed some light on the fact that stakeholders in this arena have not understood New York common-law

---

4. The dissent similarly asserts that, when Congress amended the Copyright Act to include post-1972 sound recordings but explicitly withheld the right of public performance, "Congress understood that state common law included a right of performance, for otherwise this express reservation would be unnecessary" (dissenting op at 630). But it is at least equally plausible that Congress believed that no right of public performance existed, even under the common law, and codified an explicit exclusion to make its understanding clear, particularly in light of the recording industry's lobbying efforts to create such a right. Even if Congress believed that such a right existed under state common law, such belief was unfounded as it pertained to New York.

5. This 2011 statement was revised after the present case was commenced. The Register of Copyrights clarified that, while states could recognize a performance right in sound recordings under their common law, state law did not appear to recognize such a right at that time (*see* Music Licensing Study: Second Request for Comments, 79 Fed Reg 42,834 n 3 [July 23, 2014]).

copyright to provide a right of public performance to the copyright holders of sound recordings (*see Naxos*, 4 NY3d at 561 n 9).

Indeed, it would be illogical to conclude that the right of public performance would have existed for decades without the courts recognizing such a right as a matter of state common law, and in the absence of any artist or record company attempting to enforce that right in this state until now. The absence of a right of public performance in sound recordings was discussed at the federal level for years and became acutely highlighted in 1971, upon enactment of the Sound Recording Amendment, and again in 1995, upon enactment of the DPRA. At those times, all interested parties were placed on notice of the statute's limited rights for post-1972 sound recordings. Although parties do not lose their rights merely by failing to enforce them, the fact that holders of rights to sound recordings took no action whatsoever to assert common-law protection for at least the past four decades—when the absence of a comprehensive federal right of public performance for sound recordings was clear—supports our conclusion that artists and copyright holders did not believe such a right existed in the common law.

Instead, common sense supports the explanation, articulated by the Third Circuit, that the record companies and artists had a symbiotic relationship with radio stations, and wanted them to play their records to encourage name recognition and corresponding album sales (*see Bonneville Intl. Corp.*, 347 F3d at 487-489). As the dissent acknowledges (*see* dissenting op at 632-633), the Federal Copyright Office explicitly recognized the technological advances affecting the interests of the various participants in the music industry as early as 1991 (*see* Register of Copyrights, Report on Copyright Implications of Digital Audio Transmission Services at 154-155 [Oct. 1991]). Nevertheless, those participants have coexisted for many years and, until now, were apparently "happy together." While changing technology may have rendered it more challenging for the record companies and performing artists to profit from the sale of recordings, these changes, alone, do not now warrant the precipitous creation of a common-law right that has not previously existed.

Simply stated, New York's common-law copyright has never recognized a right of public performance for pre-1972 sound recordings. Because the consequences of doing so could be

extensive and far-reaching, and there are many competing interests at stake, which we are not equipped to address, we decline to create such a right for the first time now. Even the District Court here, while finding the existence of a common-law copyright of public performance in sound recordings, acknowledged that such a right was "unprecedented," would upset settled expectations, and would "have significant economic consequences" (62 F Supp 3d at 352). Under these circumstances, the recognition of such a right should be left to the legislature.

As Congress demonstrated when it enacted the DPRA—by including mandatory licensing and a rate-setting scheme, as well as exemptions—recognizing new rights in this complex area of law involves a delicate balancing of numerous competing interests, requiring an intricate regulatory scheme that can be crafted only by a legislative body. For instance, to make practical the exercise of the right of public performance, it would certainly be necessary to have a central agency or clearinghouse—as the DPRA has established—to maintain a record of ownership rights in sound recordings.

Further, in contrast to the anti-piracy right—which is based on an acknowledgment that no relevant stakeholder has a legitimate interest in unauthorized duplication and distribution of sound recordings—some stakeholders may be harmed if we recognize a right of public performance. Composers, for instance, are paid royalties each time their song is performed publicly (see 17 USC § 106 [4]). However, if the sound recording copyright holder has control over whether and when a recording of that song is played, the composer could lose royalties. In addition, the public and the artists could be harmed by the recognition of a right of public performance. Specifically, if deterred by the costs of paying to play older songs, radio services may choose to limit or cease their broadcasts of pre-1972 music. The public will then be deprived of this music and artists will be deprived of the interest in their performances that is generated by radio broadcasting, potentially resulting in decreased revenue to the performers from record sales and from live concerts, festivals and merchandise which, in many instances, have replaced record sales as the performers' primary sources of income. These are but a few of the potential ramifications of recognizing a right of public performance; there are undoubtedly others which we have not even considered. Moreover, the requested expansion of copyright protection is

not necessary to encourage the creation of music, as it would apply only to recordings that were already created more than 40 years ago.

We cannot ignore the fact that Congress studied the nature and scope of the right to the public performance of sound recordings for nearly two decades before revising the federal statutes to recognize a limited right. Indeed, in 1976, Congress "considered at length the arguments in favor of establishing a limited performance right, in the form of a compulsory license, for copyrighted sound recordings, but concluded that the problem require[d] further study" (HR Rep 94-1476, 94th Cong, 2d Sess at 106, reprinted in 1976 US Code Cong & Admin News at 5659, 5721). As directed by the Copyright Act of 1976, the Register of Copyrights submitted a voluminous report in 1978, recommending that Congress enact a limited right to control public performances of sound recordings. Not until 1995 did Congress take action on that recommendation and enact any such right and, even then, the right it created was a narrow one circumscribed by a nuanced regulatory scheme limited to digital transmissions of post-1972 sound recordings (see Pub L 104-39 § 2 [3], 109 US Stat 336 [1995]). Moreover, as part of that statutory scheme, Congress included a requirement that the copyright holder pay a portion of the royalties to the recording artist; even if we were to recognize a common-law copyright to public performance, there is no guarantee that the artists would receive any portion of the royalties, as many copyrights are apparently held by the record companies. Ultimately, it cannot be overstated that, if this Court were to recognize a right of public performance under the common law, we would be ill-equipped—or simply unable—to create a structure of rules to properly guide the application of that right. The legislative branch, on the other hand, is uniquely qualified, and imbued with the authority, to conduct the required balancing of interests and make the necessary policy choices.

## V.

### Scope of Right

The question certified to us also asks—if we recognize a right of public performance in sound recordings—that we define the nature and scope of that right. Because we do not recognize such a right, we need not address the second portion of the

certified question. However, a brief discussion of the issue further demonstrates why we should not create the right in the first instance.

Plaintiff argues that the right of public performance should apply when a sound recording is used for "commercial purposes," but the scope of that term remains undefined. For instance, it is unclear whether the right would apply to AM/FM radio broadcasting. Traditional radio stations generate money through advertisers, who essentially pay for the music, so it may very well be that the recordings will be considered as being used for a commercial purpose in that arena. It would be irresponsible for us to recognize a right of public performance and leave open such a basic question as whether such right applies to ordinary radio. It is similarly unclear whether the right would extend only to situations in which someone is charged directly for the music—such as defendant's digital radio service, or even a jukebox—or whether the right would also apply where payment is indirect, such as to a bar that imposes a cover charge when it has a DJ who plays music. As plaintiff concedes, the public performance right might also apply to public entities, such as museums or schools. Given this uncertainty and the plethora of issues involved in deciding these questions, such line-drawing is best left to the legislature.[6]

The dissent would recognize a right of public performance in pre-1972 sound recordings that tracks the federal right in post-

---

**6.** The certified question does not differentiate between different media or types of services in the continuum of public users of sound recordings, as recounted in the concurrence, such as: terrestrial radio; free Internet radio broadcasters; subscription satellite and Internet radio broadcasters (like defendant); and interactive digital services that allow a user to "rent" the provider's library of music at any time. Regardless of the media used, we hold that the creator of the sound recording is not entitled to a right of public performance under our common law. We acknowledge that a number of questions, not raised or addressed by the parties in this case, remain unresolved. For example, as noted in the concurrence, interesting questions may come to mind concerning whether obtaining a song from an interactive digital service—which permits a paying user to select any particular song and call it up on any device at any time, or even, perhaps, to download the song and play it when not connected to the Internet—violates some protected rights of the owners of sound recordings under state common law or some other copyright principles. That question—and, indeed, others not yet envisioned based upon new and emerging technologies—remains open until addressed by the legislature or until properly presented to the Court in the context of a proceeding in which all interested stakeholders have an opportunity to provide input regarding such novel issues.

1972 sound recordings (*see* dissenting op at 633). While the dissent notes that the federal law reflects Congress's balancing of the varied and competing interests involved, this only highlights that a legislative body—not the courts—should make decisions regarding such a right.[7] Additionally, it would be highly unusual for this Court to simply adopt federal statutes as the embodiment of the scope of a state common-law right. Moreover, as a practical matter, not all aspects of the complex federal scheme can be directly incorporated under our common law. For example, in the DPRA, Congress provided a means of determining reasonable rates and royalty payments, including a dispute resolution system (*see* 17 USC § 114 [f]). However, state courts have no authority to require the federal Copyright Royalty Judges to adjudicate challenges to royalty rates on pre-1972 sound recordings (*see* 17 USC §§ 114 [f]; 801-804), nor do we have the authority to create a New York State version of that dispute resolution system.

Further, the federal Copyright Act—on which the dissent would rely to define the scope of our state's common-law right—applies nationally, not on a state-by-state basis. The dissent acknowledges that defendant's subscribers "can travel cross-country and enjoy uninterrupted and unlimited play" of music within defendant's coast-to-coast satellite coverage area (dissenting op at 618). Defendant's license from the Federal Communications Commission requires it to broadcast the same music or programs nationwide, and does not allow defendant

---

**7.** The dissent relies upon a settlement reached by these parties in a federal class action in California to support the proposition that defendant is well positioned to address claims for compensation by creators of sound recordings. Such reliance is misplaced for several reasons. First, in the California action, defendant's liability was established under a state *statute* providing a right of public performance in sound recordings (*see* Cal Civ Code § 980 [a] [2]; *see also Flo & Eddie Inc. v Sirius XM Radio Inc.*, 112 USPQ2d 1307, 2014 WL 4725382, 2014 US Dist LEXIS 139053 [CD Cal, Sept. 22, 2014, No. CV 13-5693 PSG (RZx)]). This highlights our conclusion that such a right is most appropriately created and defined by a legislative body. Second, the amount of damages for which defendant will be responsible in that action is apparently contingent on the outcomes of two other actions pending between the parties—a case brought in the Florida federal courts, and the case currently before us (*see* Jonathan Stempel, *Sirius May Settle Music Copyright Suit Brought by the Turtles for $100M*, Insurance J, Nov. 30, 2016, available at http://www.insurancejournal.com/news/national/2016/11/30/433536.htm). Third, the California settlement is not final, as it requires judicial approval (*see id.*; Amanda Bronstad, *Sirius XM Radio Agrees to Settle Copyright Case With 60s Rock Band The Turtles*, Natl LJ, Nov. 14, 2016, available at http://www.nationallawjournal.com/id=1202772377801).

to customize its programming by state or region. Despite these circumstances and the portable nature of radio service, the dissent does not address the difficulties that would arise if this Court, and other state courts across the country, were to separately determine the existence and scope of a common-law right of public performance for sound recordings and were to reach different results in neighboring jurisdictions that may share radio airwaves. Those difficulties present yet another reason why the parameters of any such right should be defined by a legislative body.

Finally, we note that sound recording copyright holders may have other causes of action, such as unfair competition, which are not directly tied to copyright law. Indeed, in the present case, plaintiff prevailed in the District Court on its causes of action alleging unfair competition and unauthorized copying of sound recordings. The Second Circuit concluded that defendant had copied plaintiff's recordings, but postponed the questions of fair use and unfair competition until after our resolution of the certified question (821 F3d at 270 n 4, 272). Thus, even in the absence of a common-law right of public performance, plaintiff has other potential avenues of recovery.

At the end of the day, the question before us is not whether recognizing a right of public performance in sound recordings is a good idea, or whether the absence of such a right enures to the detriment of any particular individual or group. Rather, the question is whether that determination should be made by this Court or whether it should be left to the legislature; in our view, the answer is decidedly the latter. We hold that New York common law does not recognize a right of public performance for creators of pre-1972 sound recordings. Accordingly, the certified question should be answered in the negative.

FAHEY, J. (concurring). I agree with my colleagues in the majority that the common law of this state does not recognize a right of public performance for the creators of sound recordings fixed prior to February 15, 1972 (see majority op at 605), and that the question whether to recognize such a right is best left to the legislature (see id. at 606). Consequently, I also generally agree with my colleagues in the majority that the pertinent part of the certified question, which asks whether there is "a right of public performance for creators of sound recordings under New York law" (Flo & Eddie, Inc. v Sirius XM Radio, Inc., 821 F3d 265, 272 [2d Cir 2016]), should be answered in the negative.

In seeking guidance from this Court, however, the United States Court of Appeals for the Second Circuit noted that we should exercise our power to "reformulate or expand [its certified] question as appropriate" (*id.* [internal quotation marks omitted]; *see Beck Chevrolet Co., Inc. v General Motors LLC*, 27 NY3d 379, 389 [2016]). That court also "welcome[d] [our] guidance on any other pertinent questions that [we] wish[ ] to address" (*Flo & Eddie, Inc.*, 821 F3d at 272). I write separately to accept that invitation.

Although the question *whether to recognize* a right of "public performance" for creators of sound recordings is for the legislature, the preliminary question *how to define* "public performance" is for this Court. In a technologically simpler time the distinction between performance and publication was easy to define. That is not true now. Presently, access to sound recordings falls along a continuum ranging from public performance to publication; it begins with AM/FM radio broadcasters (performance) and concludes with consumer purchase of compact discs or other hard copies of sound recordings (publication).

This continuum is best described in five steps:

1. AM/FM radio—sometimes called "terrestrial" radio. These broadcasters rely on advertising; access is free.
2. Internet "radio" operations (such as Pandora)—these broadcasters also have advertisers and are free.
3. Subscription broadcast services (such as defendant)— where consumers pay a monthly fee and are provided with commercial-free content in genres selected by the user (i.e., sports radio, 60s music, etc.). The service is available over the Internet and by satellite.
4. Interactive/"on-demand" services (such as Apple Music)— where, for a monthly subscription fee, consumers are provided access to an almost unlimited music library that is available at any time on multiple platforms (i.e., phone, iPad, computer). This service, in essence, rents the sound recording to the listener as long as the monthly fee is paid.
5. Purchase of a sound recording, either digital (i.e., through iTunes or Google Play) or hard copy (i.e., CD, vinyl, tape).

The Court's focus generally rests with the broadcasters on the continuum, and my concern specifically rests with the method of broadcasting in the fourth step of that series. To

permit listeners to specifically select a sound recording for use through an "on-demand" service is to rent or lease that recording to those listeners inasmuch as they do not own it, but can instantly enjoy its use. To rent or lease a sound recording through an "on-demand" service is for the provider to substitute for the purchase of that recording. To prevent the sale of a sound recording through the "on-demand" rental or lease of it is not to perform the recording, but to publish it.

To that end, while I agree with the conclusion of my colleagues in the majority that the common law of this state does not recognize a right of public performance, I would answer the pertinent part of the certified question in the negative with this caveat: "public performance" does not include the act of allowing members of the public to receive the "on-demand" transmission of particular sound recordings specifically selected by those listeners.

## Backdrop

On balance, I appreciate that the common law of this state recognizes a right of performance in works that arguably are similar to sound recordings (e.g., plays [see *Palmer v De Witt*, 47 NY 532, 535-536, 540-541 (1872)]; films [see *Brandon Films v Arjay Enters.*, 33 Misc 2d 794 (Sup Ct, NY County 1962)]; and film clips [see *Roy Export Co. Establishment of Vaduz, Liechtenstein v Columbia Broadcasting Sys., Inc.*, 672 F2d 1095, 1097-1099 (2d Cir 1982) (applying New York law)]). I also appreciate that *RCA Mfg. Co. v Whiteman* (114 F2d 86 [2d Cir 1940], *cert denied* 311 US 712 [1940]), its progeny, and the congressional treatment of copyright law do not answer the question whether the common law of this state has recognized a right of performance in sound recordings fixed prior to February 15, 1972.

The discussion of federal copyright law in the majority opinion (*see* majority op at 590-594) is helpful in reviewing the state common-law question now before us. As this Court noted in *Capitol Records, Inc. v Naxos of Am., Inc.* (4 NY3d 540 [2005]), in "examining copyright law, a page of history is worth a volume of logic" (*id.* at 546 [internal quotation marks omitted]). The evolution of the federal copyright scheme—including the recognition in 1995 of a limited performance right in recordings fixed after February 15, 1972—has been methodical and balanced. Indeed, the federal forging of that right occurred only after significant deliberation, that is, "only after Congress

heard from dozens of witnesses about the competing policy considerations, after committees produced multiple reports detailing their findings, . . . after Congress revised the proposed legislation to address each issue," and after the Register of Copyrights issued an analysis of nearly 1,000 pages "recommending a limited performance right for post-1972 recordings" (brief for defendant-appellant at 43; see HR Rep 104-274, 104th Cong, 1st Sess [1995]; S Rep 104-128, 104th Cong, 1st Sess, reprinted in 1995 US Code Cong & Admin News at 356 [1995]).

### "Terrestrial" Radio

The common law of this state evolves in a similarly measured and cautious manner (see *Campaign for Fiscal Equity, Inc. v State of New York*, 8 NY3d 14, 28 [2006]; *Norcon Power Partners v Niagara Mohawk Power Corp.*, 92 NY2d 458, 468 [1998]), and I agree with my colleagues in the majority that the question whether there is a right of public performance in sound recordings fixed prior to February 15, 1972 is best answered by the legislature. On the one hand, artists obviously have an interest in receiving compensation for the performance of sound recordings to which they have contributed from broadcasters that perform such works for a profit. Perhaps there is even a strong rationale for such compensation: the author of one of a collection of short stories undoubtedly could be entitled to a royalty with respect to the sale of that collection, and to that end it arguably is illogical that a musician who contributes to a sound recording that was fixed prior to February 15, 1972 and that is now publicly performed by a broadcaster for profit should not be entitled to a royalty with respect to that performance.

On the other hand, there are myriad reasons for us not to make such a significant leap here. The relationship between the recording industry and the "terrestrial" radio industry was and perhaps still is a strong one inasmuch as record companies have used and continue to use free airplay (or "spins") to generate revenue from album sales, concert ticket sales, and merchandising (see *Bonneville Intl. Corp. v Peters*, 347 F3d 485, 487-488 [3d Cir 2003] ["The recording industry and broadcasters existed in a sort of symbiotic relationship wherein the recording industry recognized that radio airplay was free advertising that lured consumers to retail stores where they would purchase recordings. And in return, the broadcasters

paid no fees, licensing or otherwise, to the recording industry for performance of those recordings" (footnote omitted)]; *see also* Robert L. Hilliard & Michael C. Keith, The Broadcast Century and Beyond 151 [5th ed 2010] ["(t)he recording industry manufactured the popular, youth-oriented music radio wanted and needed, and the (radio medium) provided the exposure that created a market for this product. From the perspective of the recording industry, radio was the perfect promotional vehicle for showcasing its established, as well as up-and-coming, artists"]; James N. Dertouzos, Radio Airplay and the Record Industry: An Economic Analysis at 5 [2008] ["a significant portion of music industry sales of albums and digital tracks can be attributed to radio airplay—at a minimum 14 percent and as high as 23 percent"], available at http://www.nab.org/documents/resources/061008_Dertouzos_Ptax.pdf, cached at http://www.nycourts.gov/reporter/webdocs/061008_Dertouzos_Ptax.pdf).[1]

## Internet and Satellite "Radio"

The analysis with respect to Internet and satellite broadcasters is closer. The economics of Internet and satellite "radio" (which comprise the second and third steps on my continuum) are not the same as those of "terrestrial" radio. Conventional radio has a partnership with the recording industry, and the economics of that medium have been predicated upon the idea that such broadcasters are not responsible for royalties to performers of sound recordings transmitted over their "air."

By contrast, Internet and satellite broadcasting (which include the transmissions in which defendant engages) are relatively new phenomena, meaning that they did not grow together or in harmony with the recording industry. That is, while "terrestrial" broadcasters have long contributed to the growth of the recording industry and its artists, digital broadcasters have not given corresponding assistance to that enterprise. Perhaps Congress recognized as much in passing

---

1. Perhaps the federal prohibition against "payola" also illustrates this point. "Payola" refers to the practice of paying for or otherwise inducing the broadcast of a recording on a radio station without a concomitant announcement of the acceptance of consideration in exchange for that airplay (*see* 47 USC §§ 317, 508). If "terrestrial" radio was not a promotional tool for sound recordings, then there would have been no reason for record companies and other entities interested in the sales of those recordings to have attempted to increase the number of "spins" such recordings received in the radio medium through the "payola" device.

the Digital Performance Right in Sound Recordings Act of 1995 (Pub L 104-39, § 1, 109 US Stat 336 [Nov. 1, 1995]), which granted a performance right in sound recordings fixed after February 15, 1972 and required Internet "radio" broadcasters, but not "terrestrial" radio broadcasters, to license such recordings (*see* S Rep 93-983 at 225-226 [capturing the view of six Senators that, "(f)or years, record companies . . . gratuitously provided records to (radio) stations in hope of securing exposure by repeated play over the air"]). Nevertheless, given the complex and significant nature of this performance right question, I agree with my colleagues in the majority that the legislature should determine whether to establish a right of public performance even with respect to the "new" Internet and satellite broadcasters.

## Interactive/"On-Demand" Internet Broadcasters

With respect to the fourth step on my continuum, certain Internet broadcasters—such as Apple Music, Spotify's premium subscription, Rhapsody, and Amazon's Music Unlimited offering—permit users to peruse a catalog of millions of songs and to "call them up on any device, including [one's] phone, anytime [one] wants" (Peter Kafka, *Amazon Takes on Spotify with Streaming Music Services that Cost Less than $10 a Month*, Oct. 12, 2016, http://www.cnbc.com/2016/10/12/amazon-takes-on-spotify-with-streaming-music-services-that-cost-less-than-10-a-month.html). One "can also download them, so [that one] can play them when . . . not connected to the internet" (*id.*). They cannot be directly converted to a hard copy. When the service ends, the user loses all access to music that has been downloaded.

In determining whether there is a common-law right of public performance for recordings fixed prior to February 15, 1972, we necessarily have occasion to speak to the nature and the limits of such right. In the realm of federal copyright law, "publication" is defined as "the distribution of copies or phonorecords of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending" (1-4 Nimmer on Copyright § 4.03 [B], citing 17 USC § 101; *cf. Naxos*, 4 NY3d at 560 [" 'publication' is a term of art that has distinct meanings in different contexts"]). To allow a user to regularly, specifically, and directly access an exact sound recording "on-demand" is not to facilitate the "public performance" of such recording, but to publish that work and therefore to infringe upon the right of

the copyright holder to sell it (*cf. id.* at 560 ["in the realm of sound recordings, it (is) the law in this state . . . that, in the absence of federal statutory protection, the public sale of a sound recording otherwise unprotected by statutory copyright does not constitute a publication sufficient to divest the owner of common-law copyright protection"]).

One of the amici astutely notes that "[i]ncreasing numbers of consumers have turned to digital streaming services as their primary source of musical content." In fact, "[t]he move by consumers away from owning music to renting it from services like Spotify and Apple Music has caught fire" (Neil Shah, *The Summer That Streaming Took Over*, Wall St J, Aug. 25, 2016, available at http://www.wsj.com/articles/the-summer-that-streaming-took-over-1472151516). Consumers "who pay $10 a month for a subscription to Spotify or Apple Music listen to music for a full 27 hours a week"—"three hours more a week than those who listen for free on YouTube and Spotify's ad-supported site and more than double the amount non-streamers listen" (*id.*). The rising popularity of instant, unfettered access to catalogs that may exceed 30 million sound recordings (*see* Madi Alexander & Ben Sisario, *Apple Music, Spotify and a Guide to Music Streaming Services*, NY Times, Apr. 5, 2016, available at http://www.nytimes.com/interactive/2015/06/30/business/media/music-streaming-guide.html) has dampened music sales: digital music track and compact disc sales have declined in direct correlation to the increase in the number of songs streamed through "on-demand" services (*see* Victor Luckerson, *Spotify and YouTube Are Just Killing Digital Music Sales*, Time, Jan. 3, 2014, available at http://business.time.com/2014/01/03/spotify-and-youtube-are-just-killing-digital-music-sales/).

The evolution of technology should be accompanied by the evolution of the law. The "broad and flexible power of the common law" needs "to keep pace" with this new means of music consumption (*Naxos*, 4 NY3d at 555 [internal quotation marks omitted]). We must recognize that the rental or lease of sound recordings fixed prior to February 15, 1972 by Internet broadcasters who provide the public "on-demand" access to such recordings is a form of publication under copyright law.[2]

Indeed, the "on-demand" access to sound recordings offered to the public is unique in that it requires a paid subscription

---

2. The point of my dissenting colleagues "that music streaming companies [do not] 'publish' music" in a traditional sense (dissenting op at 629 n 10)

that connects the customer to a nearly limitless catalog of music and gives the customer the power to instantly listen to recordings specifically selected by that user without purchasing even a single one of those songs.[3] In essence, unlike "terrestrial," Internet, and satellite radio operations, which select and play sound recordings *for all* of their listeners, "on-demand" services permit recordings to be selected and played *by each* of their users.

A 2011 report of the United States Copyright Office foresaw that the rise of such streaming services could lead to a fall in the sale of sound recordings (*see* Copyright Office, Federal Copyright Protection for Pre-1972 Sound Recordings: A Report of the Register of Copyrights 45 [2011] ["It is possible that a state court would entertain a claim for . . . common law copyright infringement (where) pre-1972 sound recordings were being made available through internet streaming, particularly if it were persuaded that the use was substituting for purchases of the plaintiff's recording"]). Yesterday's prediction has become today's reality.

While I agree with my colleagues in the majority that the question whether to recognize a right of "public performance" in sound recordings fixed prior to February 15, 1972 is best answered by the legislature, I would conclude that "public performance" does not include the act of allowing members of the public to receive the "on-demand" transmission of sound recordings specifically selected by those listeners.

RIVERA, J. (dissenting). On this certified question, the United States Court of Appeals for the Second Circuit asks whether New York recognizes a right of public performance in sound recordings and, if so, what is the scope of such right (*Flo & Eddie, Inc. v Sirius XM Radio, Inc.*, 821 F3d 265, 272 [2d Cir 2016]). Contrary to the conclusion of my colleagues, New York's broad and flexible common-law copyright protections for sound recordings encompass a public performance right that extends to the outer boundaries of current federal law, and ceases upon preemption by Congress.

---

misses the mark. The new technology that is "on-demand" music streaming has given rise to what effectively is the new means of publication addressed herein.

3. Of course, in this scenario, the "on-demand" providers benefit from the rental of the music in their catalogs to their subscribers, but artists and the recording companies are denied the opportunity to sell their music to those listeners.

## I.

The Turtles are an American rock band that formed in the 1960s and signed to White Whale Records in 1965. The band had a number of hit songs—the most notable of their songs is "Happy Together," which reached the number one spot on the Billboard charts in 1967 and is considered a quintessential 1960s recording.

The band acquired the copyright to the master recordings of their albums in 1971 after they sued White Whale Records for underpayment of royalties. Thereafter, two band members bought out the others' rights to the albums and incorporated ownership of the recording's copyright under "Flo & Eddie, Inc." Since that time, Flo & Eddie has licensed the Turtles' songs for use in movies, television and commercials, and for digital sale through music vendors like iTunes and Amazon.

Sirius XM Radio Inc. (Sirius) is a commercial radio broadcast company with over 25 million subscribers, making it one of the largest radio and Internet-radio broadcast companies in the United States. Unlike traditional AM/FM radio, Sirius charges subscribers a monthly fee, ranging from $9.99 to $18.99 per month, to generate revenue for its music broadcasting and streaming services. Sirius offers access to a variety of music, talk shows, sports coverage, and news broadcasts through satellite and Internet connections for play on personal computers and media devices. One of its main selling points is that Sirius subscribers can personalize the commercial-free music channels.

Sirius markets itself as a replacement for AM/FM radio by offering a broader reception range than terrestrial radio, available in vehicles of every major United States automobile company. Like some AM/FM channels, Sirius also features themed channels, including separate stations for period music, for example from the 1940s, 1950s, and 1960s. Yet, unlike traditional AM/FM radio with its limited reception, Sirius subscribers pay for seamless listening of various music genres, provided commercial-free, 24 hours a day, seven days a week, for the entire period their subscription is effective. Thus, without having to change channels, a subscriber can travel cross-country and enjoy uninterrupted and unlimited play of self-selected music within the Sirius coast-to-coast satellite coverage area. Additionally, Sirius provides a "rewind" function for its radio channels, which allows subscribers to jump back

in the broadcast up to five hours in the past and replay music that has already aired.[1]

Sirius also allows subscribers to download music directly from its website, so that the subscriber can listen to a desired song from a computer or a variety of mobile media devices at any time. Additionally, Sirius has a streaming service, which allows subscribers with Internet or cellular access to stream any song in the Sirius catalog on-demand, without waiting to download a file.[2]

Sirius has a library of over 280,000 songs, and 42,000 of these songs were recorded prior to 1972. The pre-1972 library includes songs by the Turtles, 15 of which have been "performed," meaning broadcast or streamed, by Sirius. At the time the Sirius executives were deposed, Sirius had never entered into a licensing agreement to broadcast any of the pre-1972 songs from its library, and did not believe it needed such an agreement.[3]

The business model and commercial success of Sirius and other digital music providers has dramatically and permanently changed the music industry. The primacy of terrestrial and analog radio is a thing of the past. Gone are the days when a listener's sole means of acquiring music for personal enjoyment was by obtaining a record, cassette tape, or compact disc. The fast-paced changes wrought by the "digital music era" have caused devastating impacts on the music industry. In its first iteration, peer-to-peer sharing programs allowed free access to music by illegally downloading audio files—this undercut record and compact disc sales and threatened traditional revenue streams for record companies and artists (*see A&M Records,*

---

1. Comparatively, traditional AM/FM radio stations, or terrestrial stations, have a broadcast range that is limited by the Federal Communications Commission (*see generally* 47 CFR part 73). While in range, the radio listener does not have the ability to rewind a song that has already been broadcast.

2. This is similar to services offered by other music streaming providers, such as Spotify or Apple Music.

3. Since the interposition of this lawsuit, Sirius settled a separate lawsuit that requires it to pay record labels for the performance of the pre-1972 recordings in which the labels hold copyrights (U.S. Securities & Exchange Commission, Form 10-K [Feb. 2, 2016] at 12, Commission File No. 001-34295, Registrant: Sirius XM Holdings Inc.). This settlement agreement essentially creates a temporary licensing scheme, as Sirius will pay royalties for any broadcast from 2013 to 2017 (*id.*). Additionally, Flo & Eddie agreed to settle its other lawsuit against Sirius, which was filed in a California federal court and is pending court approval (*see Flo & Eddie, Inc. v Sirius XM Radio Inc.,* US Dist Ct, CD Cal, No. 13-CV-05693, 2016).

*Inc. v Napster, Inc.*, 239 F3d 1004, 1016-1017 [9th Cir 2001]; *see also* Tamara Kurtzman, *The Day Big Music Died*, 20 J Internet L 1, 8-9 [2016]). With the arrival of legal downloading programs that charge customers to purchase music downloads, such as iTunes, the music industry found a new source of revenue (*see* Recording Industry Association of America, Year End Statistics, 1989-2007). However, that revenue has been "cannibalized" by the growing popularity of services that allow a listener to stream and download music for a flat subscription rate (78 Fed Reg 23,054, 23,066 [Apr. 17, 2013] [capturing Sirius' comments to proposed rule change, in which Sirius noted that streaming services cannibalize record sales]).

Throughout this evolution in the manner by which a listener accesses and enjoys music, the market for records, tapes, and compact discs from which music is communicated and perceived has continued to shrink and is likely never to rebound (*see* Kurtzman, *supra* at 10). As these technological advances continue to rock the music industry, Flo & Eddie have turned to the courts and asserted their copyright interests in the performance of their songs and the profits made by Sirius from playing and facilitating digital access to the Turtles' music.

In their New York federal lawsuit, Flo & Eddie alleged, in part, that Sirius violated New York's common-law right of public performance by broadcasting and streaming pre-1972 sound recordings without a license, and collecting revenue from subscribers who pay to hear the music. They successfully defended against summary judgment and found a receptive ear in the district court, which held that New York's common law recognizes a right of public performance. After the Second Circuit accepted an interlocutory appeal squarely presenting the issue, that court certified the following question for our consideration: "Is there a right of public performance for creators of sound recordings under New York law and, if so, what is the nature and scope of that right?" (*Flo & Eddie, Inc.*, 821 F3d at 272).

Contrary to my colleagues, I conclude that decisional law, statutory mandates, legislative history, and the doctrinal foundations of private rights of ownership compel a determination that our common law recognizes a creator's right of public performance in sound recordings. The beneficial contours of this right and the creator's interests in receiving compensation for the labor that produced the sound recording align with society's interest in avoiding exploitation of artists and their

creative works. This right is balanced against the goal of increasing public access to creative works, the expectations of certain sectors of the music recording industry, and the reality that Congress has placed a time limit on common-law protections for pre-1972 sound recordings while providing a limited right of public performance for all sound recordings made after February 15, 1972.

I reject a parochialism that justifies turning a blind eye to the exploitative practices of today's music industry made possible by technological advances and that, as a consequence, excludes from our common-law copyright in sound recordings a quintessential property interest in the use of these works, and limits a creator's opportunity to derive financial benefit from their performance (majority op at 594-595; concurring op at 613). As this Court has previously stated, "[t]he common law is not rigid and inflexible . . . . [It is] a living organism which grows and moves in response to the larger and fuller development of the nation" (*Oppenheim v Kridel*, 236 NY 156, 163-164 [1923]). Indeed, it is this Court's duty to apply New York's common-law copyright to the changing landscape of the music industry and protect the interests of creators of sound recordings against those who profit from the fruits of others' labor, without compensating the copyright holder, and do so in a manner that jeopardizes the primary source of revenue for creative genius.

## II.

As far back as 1831, federal law has provided a copyright for musical compositions (Copyright Act of 1831 [21st Cong, 2d Sess, ch 16], 4 US Stat 436; *see also Bonneville Intl. Corp. v Peters*, 347 F3d 485, 487 [2003]). However, federal copyright law has continually relied on common-law principles and, since 1909, the federal Copyright Act has consistently expressed that state common law, unless preempted, may afford copyright protections for sound recordings (17 USC § 2, as added by Pub L 60-349, § 2, 35 US Stat 1076 [1909]; *Capitol Records, Inc. v Naxos of Am., Inc.*, 4 NY3d 540, 553 [2005]). In 1971, when Congress first confirmed copyright protections for sound recordings that are fixed, meaning recorded, on or after February 15, 1972, it also left untouched any state rights with respect to sound recordings fixed before that date (Sound Recordings Act, Pub L 92-140, 85 US Stat 391 [1971], codified at 17 USC § 102 [a] [7]). The United States Supreme Court has upheld the constitutionality of this dual copyright system, and recognized,

that where Congress "has left the area unattended, . . . no reason exists why the State should not be free to act" (*Goldstein v California*, 412 US 546, 570 [1973]).

Congress provided a limited right of public performance in 1995, entitling copyright holders to royalties when the recording was performed, i.e. broadcast via digital audio transmission (17 USC § 106 [6]). Once again, Congress maintained a role for state law and declared that "[w]ith respect to sound recordings fixed before February 15, 1972, any rights or remedies under the common law or statutes of any State shall not be annulled or limited by this title until February 15, 2067" (*id.* § 301 [c]). The federal law left to the states the choice both to recognize a copyright in sound recordings and to define the parameters of state law protections. Thus, with respect to the issues presented by the certified question, not only is the "area unattended," but Congress has specifically accounted for state copyright protections (*see id.* § 301 [c]).

In response to a previous certified question from the Second Circuit, this Court clarified that our State's common-law copyright protections apply to pre-1972 sound recordings (*Naxos*, 4 NY3d at 560). As part of a comprehensive discussion of the history of United States copyright law, with its roots in English copyright, and upon a thorough review of federal legislation, the Court stated that federal copyright developed to address concerns related to "property rights in tangible intellectual products" (*id.* at 546). The Court explained that "[w]ith the dawn of the 20th century, courts throughout the country were confronted with issues regarding the application of copyright statutes, which were created with sole reference to the written word, to new forms of communication. One of the first such challenges involved music" (*id.* at 552). Specifically, the Court identified a common-law history of protection for sound recordings and held that, absent specific federal preemption, the common law was free to identify the moment of divestment of common-law protections in audio musical works (*id.* at 552-553).

With regard to when federal copyright preempts state common law—which occurs upon "first publication"—the Court noted that for literary works, the point of divestment of common-law rights historically was the moment of public distribution of the writing (*id.* at 560). In the context of audio recordings, several early opinions rejected the sale of a record as "publication" for sound recordings because the copyright

holder did not intend to relinquish control over a performance by selling a record of the musical work (*id.* at 552-555, citing *Metropolitan Opera Assn., Inc. v Wagner-Nichols Recorder Corp.*, 199 Misc 786, 798 [Sup Ct, NY County 1950]; *Waring v WDAS Broadcasting Sta.*, 327 Pa 433, 443, 194 A 631, 636 [1937]). The *Naxos* Court similarly concluded that, so long as the federal law has not preempted state copyright law as regards sound recordings, our common law does not treat the broadcast of the recording as a publication that divests a copyright holder of any common-law copyright: "in the realm of sound recordings, it has been the law in this state for over 50 years that, in the absence of federal statutory protection, the public sale of a sound recording otherwise unprotected by statutory copyright does not constitute a publication sufficient to divest the owner of common-law copyright protection" (*id.* at 560 [citations omitted]).

In reaching this conclusion, the Court made two significant observations. First, that "the historical distinction in the treatment of literary and musical works by Congress accounts for the lack of federal statutory copyright protection for sound recordings," and "[i]n the absence of protective legislation, Congress intended that the owner of rights to a sound recording should rely on the 'broad and flexible' power of the common law to protect those property rights after public dissemination of the work" (*id.* at 555). Second, that "both the judiciary and the State Legislature intended to fill [the] void" left by the federal Copyright Act "by protecting the owners of sound recordings in the absence of congressional action" (*id.* at 559). Based on this understanding of the elasticity of New York's common law in the area of copyright as grounded in our State's interest in protecting recordings not covered by federal law and the historical changes in technology impacting musical artists, the *Naxos* Court declared that "the common law 'has allowed the courts to keep pace with constantly changing technological and economic aspects so as to reach just and realistic results' " (*id.* at 555, quoting *Metropolitan Opera*, 199 Misc at 799).

Thus, until the 2067 effective date of federal preemption, our common-law copyright governs the rights and remedies available to owners of sound recordings, and a copyright holder's interests are not relinquished by the mere sale of the musical work. While the federal Copyright Act provides a copyright in a musical composition for "the notes and lyrics of the song" and a

copyright for "the recorded musical work performed by a specific artist" for sound recordings fixed after February 15, 1972 (*Recording Indus. Assn. of Am., Inc. v Librarian of Congress*, 608 F3d 861, 863 [DC Cir 2010]; 17 USC §§ 102 [a]; 302 [a]), our state common-law copyright for pre-February 15, 1972 sound recordings is subject to a federally designated shelf life. The Second Circuit asks whether our common law encompasses a right of public performance, viable until the effective date of federal preemption. I believe such right is a constituent part of a creator's property interests in a sound recording.

## III.

The multiple rights of ownership, use, and possession are expressed as " 'a bundle of sticks'—a collection of individual rights which, in certain combinations, constitute property" (*United States v Craft*, 535 US 274, 278 [2002]). "It is axiomatic, of course, that state law is the source of those strands that constitute a property owner's bundle of property rights" (*Nollan v California Coastal Comm'n*, 483 US 825, 857 [1987, Brennan, J., dissenting]; *see also* 63C Am Jur 2d, Property § 1).

This long-standing conceptualization of property rights applies to a copyright holder's interest in tangible and intangible intellectual products, and includes a right of public performance (17 USC § 106 [4]; *Harper & Row, Publishers, Inc. v Nation Enterprises*, 471 US 539, 546 [1985] ["Section 106 of the Copyright Act confers a bundle of exclusive rights to the owner of the copyright"]; *Penguin Group [USA] Inc. v American Buddha*, 16 NY3d 295, 305 [2011] ["The Copyright Act gives owners of copyrighted literary works five 'exclusive rights,' which include the right of reproduction; the right to prepare derivative works; the right to distribute copies by sale, rental, lease or lending; the right to perform the work publicly; and the right to display the work publicly"]; S Rep 94-473, 94th Cong, 1st Sess [1975] ["These exclusive rights, which comprise the so-called 'bundle of rights' that is a copyright, are cumulative and may overlap in some cases"]).[4]

Like tangible property rights, the intangible rights subject to copyright law may be relinquished in whole or part, as the

4. In other litigation between the parties, Sirius has acknowledged the applicability of the "bundle of rights" analogy to copyright ownership, while maintaining that it does not include exclusive rights of public performance (*see Flo & Eddie, Inc. v Sirius XM Radio Inc.*, 2014 WL 4725382, *3, 2014 US Dist LEXIS 139053, *6-7 [CD Cal, Sept. 22, 2014, No. CV 13-5693 PSG (RZx)]).

holder deems most appropriate and beneficial (*see Mills Music, Inc. v Snyder*, 469 US 153, 173-174 [1985] [recognizing that the bundle of rights associated with a copyright in a literary work can be alienated]; *see also* S Rep 94-473, 94th Cong, 1st Sess [1975]). This basic tenet of property law is central to determining whether there is any reason to exclude a right of public performance from the bundle of rights in a sound recording.

Indeed, New York courts have recognized a right of performance in other media (*see e.g. Palmer v De Witt*, 47 NY 532, 535-536 [1872] [plays]; *Brandon Films v Arjay Enters.*, 33 Misc 2d 794 [Sup Ct, NY County 1962] [films]; *De Mille Co. v Casey*, 121 Misc 78, 87-88 [Sup Ct, NY County 1923] [photoplays]).[5] There is no logical basis to distinguish between the copyright protections of those works and a sound recording. All involve creative inspiration and genius, application of artistic ability, and the development of a final product marketable to the public. The creator's interest in the sound recording is no less real or significant than with other forms by which an artist communicates a creative idea, a concept that the majority ignores in reaching its conclusion. Indeed, addressing a slightly different matter, this Court in *Naxos* recognized performance is not the same as the mode of reproduction, and stated that the copyright holder in that case "has a protected property interest in the performances embodied on the shellac records" (*Naxos*, 4 NY3d at 564 n 11).

The right to perform a sound recording publicly is a property interest in a specific rendition of an artistic work. This public expression of the musical composition has its own unique aesthetic quality, which, once recorded, preserves for the future the artist's contribution to the final work. Thus, the distinctiveness of the work as heard is due in part to the artist's execution of the musical composition. When an artist brings to life the notes of a song and instrumental composition, the artist's rendition is a personal representation of the musical piece. Nat King Cole's silk-voiced rendition of "Unforgettable" and "The Christmas Song," Frank Sinatra's self-assured version of "My Way," Peggy Lee's highly lyricized "Fever," Aretha Franklin's

---

5. The *Naxos* Court provided a thorough explanation of the New York courts' treatment of common-law copyright issues. Though the majority attempts to recharacterize the *Naxos* treatment of this jurisprudence to reach its conclusion, I find no occasion to recast the line of cases discussed in *Naxos*.

commanding "Respect," Doris Day's full-voiced "Que Sera, Sera," the Beatles' harmonious "Hey Jude" and unbridled "Revolution," Billie Holiday's aching performance of "Strange Fruit," Jimi Hendrix' electric performance of "The Star-Spangled Banner," Marvin Gaye's enchanting "What's Going On," and the Turtles' "Happy Together" are but some examples of the most well-known and beloved artistic renditions of musical works available to the public through a tangible medium.[6] These performances—like those of lesser known and unpromoted or minimally commercially promoted artists—reflect skill and verve essential to an interpretive creative work. Most importantly, they constitute an interest in property no less consequential or worthy of legal recognition and protection than the property interest in the musical composition, for without the artist's performance there would be no sound recording.[7] Indeed, the sound recording is a different product from the musical composition, i.e. the combination of music notes and, in the case of songs, the lyrics. Moreover, each rendition is a version that can be made available by publicizing its performance.[8]

---

**6.** Most of these songs are in the Sirius library, and the company advertises these recordings on its website as a means to attract customers (Sirius XM, Channel Lineup, www.siriusxm.com/channellineup/?hpid=02010023&intcmp=SXM_HP-NAV_0916_DEF_HDR_PROG_CHANNEL-LINEUP [last visited Nov. 7, 2016]).

**7.** Several amici contend that the right of performance is unnecessary because record labels hold the copyrights to most pre-1972 recordings, not the artists (*see e.g.* brief of CBS Radio Inc. as amicus curiae in support of appellant Sirius XM Radio Inc. at 16-18, citing Register of Copyrights, Report on Performance Rights in Sound Recordings, HR Doc 15, 95th Cong, 2d Sess at 824 [1978], Comments of Jack Golodner, Executive Secretary of the Council of AFL-CIO Unions for Professional Employees). Yet, the plaintiff-respondent in this very case is an entity which has a copyright in the music that its owners expended creative energy to create. Even assuming the number of artists who would benefit from a right of performance in pre-1972 works is small, there is no reason to interpret our common law narrowly to deny them compensation for their creative work. The alternative would allow digital audio broadcasters to reap the exclusive profits from performing the musical recordings by a means that diminishes potential compensation for copyright holders. This is a particularly unjust outcome given that the companies were not part of the creative process, and do little to maintain the demand for the creator's traditional revenue source—purchase of an ownership right in a reproduction of the sound recording.

**8.** Thus, the Turtles have an interest in the publication of their performance of their music, as well as the public performance of a rendition of their songs by others.

The law's protection for just such a property interest in a performance was recognized early on in *Metropolitan Opera.* That court held "[t]he law has also . . . protected the creative element in intellectual productions—that is, the form or sequence of expression, the new combination of colors, sounds or words presented by the production" (199 Misc at 798; *see also Naxos*, 4 NY3d at 555 [adopting the reasoning of *Metropolitan Opera*]).

Other jurisdictions have recognized that the creative value of a performance gives rise to a property interest in controlling the broadcast of that performance. The Supreme Court of Pennsylvania in *Waring v WDAS Broadcasting Sta.* (327 Pa 433, 194 A 631 [1937]) upheld an injunction barring an unauthorized radio station's broadcast of an orchestra's performance, and noted:

> "[a] musical composition in itself is an incomplete work; the written page evidences only one of the creative acts which are necessary for its enjoyment; it is the performer who must consummate the work by transforming it into sound. If, in so doing, [the performer] contributes by . . . interpretation something of novel intellectual or artistic value, [the performer] has undoubtedly participated in the creation of a product in which [the performer] is entitled to a right of property, which in no way overlaps or duplicates that of the author in the musical composition" (327 Pa at 441, 194 A at 635).

Similarly, in *Waring v Dunlea* (26 F Supp 338, 340 [ED NC 1939]), a federal district court recognized a right of performance, explaining:

> "The great singers and actors of this day give something to the composition that is particularly theirs, and to say that they could not limit its use is to deny them the right to distribute their art, as they may see fit, when they see fit. Surely, their labors and talents are entitled to the privilege of distribution, especially where, as here, the privilege is subject to definite terms and bounds" (*id.*).

Moreover, as *Metropolitan Opera* recognized, "[t]o refuse to the groups who expend time, effort, money and great skill in producing these artistic performances the protection of giving them a 'property right' in the resulting artistic creation would

contrary to existing law, inequitable, and repugnant to the public interest" (*Metropolitan Opera*, 199 Misc at 802). This same appreciation for the labor and creative skill represented by a performance can also be found in a report on the right of public performance issued by the Federal Copyright Office.[9] In that report, the Copyright Office stated that "[p]erformers are in the professional position of being forced to compete with, and of eventually being driven out of work by, their own recorded performances" (Register of Copyrights, Performance Rights in Sound Recordings, HR Doc 15, 95th Cong, 2d Sess at 4 [1978]). As further explained in the report, "[i]n the history of the communications revolution, performers offer the most dramatic examples of the concept known as 'technological unemployment' " (*id.*).

Similarly, excluding the right of public performance from the creator's copyright is contrary to society's interest in protecting those whose labor has produced creative works (*see Harper & Row, Publishers, Inc. v Nation Enterprises*, 471 US 539, 548 [1985] [explaining that an author's labor must be a protected interest when considering the fair use defense in a federal copyright claim]). Indeed, it rewards practices that undermine the traditional forms of revenue that sustain artists, and indulges exploitation made possible by the type of technology described in the instant case.

Nevertheless, Sirius urges this Court to rely on *RCA Mfg. Co. v Whiteman* (114 F2d 86, 89 [2d Cir 1940]) as the precedent upon which to determine that no right of performance has ever existed, but such reliance is misplaced. In that case, the Second Circuit determined that common law and statutory copyright protections prevent only unauthorized reproduction of a copyrighted work (*id.*). A copyright holder lost any control over the performance of a recording once that recording was broadcast because the broadcast constituted publication, such that the copyright holder could not control the broadcast of the recording in the future (*id.* at 88). The court dismissed a

---

**9.** The Copyright Office is the administrative agency responsible for executing the Copyright Act and is led by the Register of Copyrights (17 USC § 701). This office has been a sub-agency of the Library of Congress since 1897 and, since that time, the Register of Copyrights has been the "principal advisor to Congress on national and international copyright matters" by providing "impartial expertise on copyright law and policy" (Library of Congress, US Copyright Office, Overview of the Copyright Office, http:// www.copyright.gov/about/ [last visited Nov. 7, 2016], cached at http:// www.nycourts.gov/reporter/webdocs/https___www.copyright.pdf).

complaint that sought to enjoin a radio station from broadcasting a sound recording because the copyright owner lost any right to control that performance by publishing the recording (*id.* at 88).

The Second Circuit overruled *Whiteman* in *Capitol Records v Mercury Records Corp.* (221 F2d 657, 663 [2d Cir 1955]), explaining that the *Metropolitan Opera* decision clarified that the broadcast of a sound recording did not constitute publication of that recording and did not result in relinquishment of a right to control the performance of the recording (*id.*, citing *Metropolitan Opera*, 199 Misc at 786).

The *Metropolitan Opera* approach to publication comports with the modern understanding of publication. As the Court has recognized, "the public sale of a sound recording otherwise unprotected by statutory copyright does not constitute a publication sufficient to divest the owner of common-law copyright protection" (*Naxos*, 4 NY3d at 560). Rather, publication is the point at which a copyright holder expressly and intentionally relinquishes any future right to control any aspect of the work's future use (*id.*). In other words, publication only occurs when the copyright holder gives up all of the sticks in the bundle.[10] Therefore, the broadcast of a sound recording does not constitute publication in the modern sense, and this aspect of *Whiteman*'s reasoning is erroneous.

Moreover, the underlying premise of *Whiteman* is inconsistent with the current understanding of a what copyright entails. The federal Copyright Act recognizes a copyright holder's varied rights in property, such that the "bundle of sticks" metaphor describes a multi-faceted protection of interests (*e.g. Harper & Row*, 471 US at 546; 17 USC § 106 [4]). When the Copyright Act was amended in 1976, the Senate Report for the proposed bill indicated that section 106 was a codification of the "bundle of rights," i.e. "the exclusive rights of reproduction, adaptation, publication, performance, and display" (S Rep 94-473, 94th Cong, 1st Sess [1975]). At the time, Congress's inclusion of a right of performance in the statute indicated that it

---

**10.** I disagree with the concurrence to the extent my colleague espouses the view that music streaming companies "publish" music (concurring op at 616). A basic tenet of copyright law is that the right of publication is solely the right of the owner and occurs only when the copyright holder "relinquishes" further rights in the work by "some unequivocal act indicating an intent to dedicate it to the public" (*Palmer*, 47 NY at 543). This definition of "publication" is not in dispute here (*see* 17 USC § 101; *Naxos*, 4 NY2d at 557).

understood that state common law included a right of perform-ance for other types of artistic works (17 USC § 301 [c]). *White-man*'s limited characterization of what a copyright entails is no longer the accepted understanding. Moreover, limiting New York's common law to reproduction of a record ignores the real-ity that a performance is an integral part of a sound recording and that our common law is not static, but rather allows for development of appropriate responses to technological advances (*Woods v Lancet*, 303 NY 349, 354 [1951] ["(I)t is the duty of the court to bring the law into accordance with present day standards of wisdom and justice rather than with some outworn and antiquated rule of the past"]).

To be sure, copyright in a sound recording has a peculiar his-tory because it was made possible by technological advances that distinguish it from copyright in the written word, and, as discussed, initially sound recordings were not protected by federal copyright law (*see Naxos*, 4 NY3d at 552). When Congress amended the federal Copyright Act in 1972 to include post-1972 sound recordings, it explicitly withheld a right of performance from sound recording copyright holders (*see* 17 USC §§ 106 [4]; 114 [a]). At the time, Congress understood that state common law included a right of performance, for otherwise this express reservation would be unnecessary (*id.* § 301 [c]).

My colleagues' grounds for excluding the right of public per-formance from New York's common-law copyright in sound re-cordings are unpersuasive. The first reason is that no such right has previously been recognized in New York (majority op at 604). However, as I have discussed, a generic right of public performance as part of a copyright holder's "bundle of rights" is well-established in decisional law and property doctrine. The fact that until now there has been no detailed explication on the right of public performance in sound recordings from this Court does not inexorably lead to the conclusion that no such right exists. Of course, since no New York state court has rejected the right of public performance, there is also no basis to exclude such right from the copyright holder's protections. Regardless, the United States Supreme Court has warned against placing significance on the delayed assertions of copyright protections. "It is hardly incumbent on copyright owners . . . to challenge each and every actionable infringe-ment. And there is nothing untoward about waiting to see whether an infringer's exploitation undercuts the value of the

copyrighted work, has no effect on the original work, or even complements it" (*Petrella v Metro-Goldwyn-Mayer, Inc.*, 572 US —, —, 134 S Ct 1962, 1976 [2014]; *see also District of Columbia v Heller*, 554 US 570, 625 [2008]).

The fact that the issue is now presented for our consideration reflects the realities of the music industry and the impact of technological advances on industry and customer practices, rather than consensus on the nonexistence of a common-law right of public performance. This leads to my colleagues' second reason for excluding the right of performance from the interests of creators of sound recordings, namely their conclusion that music industry members historically understood that there is no right of performance (majority op at 604-605). However, the fact that some in the music industry argued for a federal right does not disclaim the existence of a common-law right. Rather, the majority's reference to a four decade "inaction" is a red herring—the music industry has changed drastically since 1971 and 1995, as the ways in which fans enjoyed music are dramatically different than the digital delivery technology at issue here. The attendant consequences of this sea change for the industry and individual artists is well documented, providing the basis for the inference that this change in circumstances prompted copyright holders to invoke their rights. Further, if, as claimed, everyone in the music industry understood that no right of performance existed, there would be no reason for Congress to legislate on the assumption that state common law protects the right of performance and no need to set a 2067 date for federal preemption of such right (17 USC § 301 [c]).

The last reason my colleagues assert for denying the right is perhaps the most unsupportable because it is grounded in the perception that it is too difficult to define the scope of such a right (majority op at 606-607). Whether a right exists is a question separate from the expanse of the right, and the considerations regarding how best to protect the right as against competing interests and societal goals serve as no excuse for removing this "stick" from a copyright holder's bundle of rights. Our common law does not bow to the challenges brought about by change. Rather, "[o]ur court said, long ago, that it had not only the right but the duty to re-examine a question where justice demands it" (*Woods*, 303 NY at 354). The law, and the equities as they stand today, support recognition of a creator's right of public performance in a sound recording.

### IV.

Turning to the scope of the right of public performance under New York law, my guiding principle is that the right of public performance addresses the imbalance of financial incentives and revenue streams. The commercial gain in digital transmissions that are charged directly to the customer reduces the customer's incentive to purchase a copy of the sound recording in some other format that might garner financial gain to the copyright holder—for example where the performer is also the composer or holds other copyright interests. To this extent I am in agreement with my concurring colleague (concurring op at 614-615). A common-law right of public performance protects against technologies that reap financial gains from musical works and that jeopardize prior revenue streams of copyright holders, while also allowing the copyright holder to share in the profits. Moreover, the Court has long recognized its power to develop the common law when the legislature has failed to act but justice demands a change (*see Woods*, 303 NY at 354).

The analysis is informed by this Court's acknowledgment that "state common-law copyright protection is no longer perpetual for sound recordings not covered by the federal act (those fixed before February 15, 1972), because the federal act mandates that any state common-law rights will cease on February 15, 2067" (*Naxos*, 4 NY3d at 560). For sound recordings fixed after February 15, 1972, federal law provides payment to copyright holders in sound recordings when broadcast via an interactive service (e.g. Spotify or Sirius' streaming service), a radio station that requires a subscription (e.g. Sirius or Pandora), or certain other methods of rebroadcasting a licensed broadcast (17 USC § 114).

Before enactment of the federal law, Congress was made acutely aware of the urgency of establishing protections against the impact of digital broadcasting. In its 1991 report, the Copyright Office declared that

> "[t]hirteen years have passed since the Copyright Office formally recommended to the Congress the enactment of a public performance right in sound recordings. Technological changes have occurred that facilitate transmission of sound recordings to huge audiences. Satellite and digital technologies make possible the celestial jukebox, music on demand, and pay-per-listen services. . . . Sound

recording authors and proprietors are harmed by the lack of a performance right in their works" (Register of Copyright, Report on Copyright Implications of Digital Audio Transmission Services at 154-155 [Oct. 1991]).

Those same interests and concerns inform the proper boundaries of the public performance right for recordings that are fixed pre-February 15, 1972 and protected only by our common law.

Given our State's long history of protecting rights in creative works (*see Metropolitan Opera*, 199 Misc at 786; *Naxos*, 4 NY3d at 560; former Penal Law § 441-c [L 1966, ch 988]) and recognizing that the federal law currently anticipates full preemption in 2067, our common-law right of public performance in pre-1972 sound recordings best serves both the creator and the public interest in access to those recordings by tracking the federal public performance right in post-1972 musical works.

Our common law is, of course, a creature of the state, recognized and expanded by our courts. It is independent of federal law and not limited by what may be national concerns addressed by federal legislation. However, the fact that federal law exists is important, especially in an area where Congress has specifically chosen to preempt state common-law rights in the future. The fact that a New York common-law right of public performance may serve state interests by drawing upon federal law does not ignore the primacy of our common law or diminish its status. Indeed, consideration of the current system of compensation under federal copyright law provides a much needed understanding of the impact of a common-law right of public performance on the music industry, and the mechanics of protecting that right. Further extending to pre-February 15, 1972 sound recordings protection that is at least equivalent to the federal right recognized in the post-1972 works allows us to treat both classes of sound recordings equally and avoids enhanced rights for one based not on a considered reason but on an arbitrary date.

Notably, applying protections and limitations to define the right of performance that has been in place under federal law for over 20 years builds on an established framework, and one that is familiar to music industry stakeholders. Just as the industry adapted to paying royalties for the performance of sound recordings made after February 15, 1972, it will do the same under our common law for pre-1972 recordings, this time

with the experience and wisdom of having done so under the federal law. Sirius is particularly well placed to address claims for compensation since it has settled with other record labels to temporarily pay licensing fees for its broadcast of pre-1972 recordings.[11]

Limiting the common-law right of public performance in sound recordings by exempting traditional AM/FM radio stations' analog broadcasts recognizes the benefits to copyright holders from the airing of musical works through terrestrial radio. The broadcasts popularized the music played on the "airwaves" and incentivized purchase of the recordings (*e.g. Bonneville*, 347 F3d at 487-488 [discussing the symbiotic relationship between the recording industry and AM/FM radio stations]). There is no reason to extend protections against a performance medium that has increased revenue and—unlike digital performances—poses no financial threat to copyright holders.[12] Similarly, exclusions for individual use—as compared to for-profit wholesale performance by Sirius and other digital music delivery entities—benefit the copyright holder without affecting the bottom line.

---

**11.** The existence of Sirius' settlement agreements are relevant only to the extent that they demonstrate Sirius is no stranger to dealing with the performance right at issue—clearly, Sirius is able both to negotiate and enter into licensing agreements with those who hold a copyright in sound recording. Yet, the majority misconstrues my reference to these settlements (majority op at 609 n 7). The fact that the other settlement arose out of a claim under a California statute is of no import, as Sirius' *ability* to deal with performance rights is agnostic of the source of law that created the right.

**12.** The exemption would have limited adverse impact on the creator's interest because analog radio performance is of little relevance in today's digital music world, particularly on record sales (*see* Kurtzman, *supra* at 7). It is true that terrestrial radio stations have maintained listenership during the surge of both satellite and web-based radio (Nancy Vogt, Pew Research Center for Journalism & Media, *Audio: Fact Sheet* [June 15, 2016], http://www.journalism.org/2016/06/15/audio-fact-sheet/, cached at http://www.nycourts.gov/reporter/webdocs/http___www.journalism.pdf). However, the major radio broadcast companies are facing crippling debt, a problem that is not expected to be fixed anytime soon (Steve Knopper, *Is Terrestrial Radio Facing Its Judgment Day with Fierce Digital Competition?*, Billboard, May 19, 2016, www.billboard.com/articles/business/7378152/terrestrial-radio-digital-competition-iheartradio-cumulus). Moreover, though Americans continue to tune into terrestrial radio stations, this has done little to improve the well-documented plummet in sales of sound recordings in any form (Ben Sisario & Karl Russell, *In Shift to Streaming, Music Business Has Lost Billions*, NY Times, Mar. 24, 2016). As these statistics indicate, terrestrial radio has been pushed to the margins to the extent that the "symbiotic relationship" between the recording industry and broadcast companies has weakened.

## V.

For the reasons I have explained, I would answer the certified question in the affirmative and define the scope of New York's common-law copyright protections as coterminous with current federal law. Recognizing this right and defining its limits in this way is in line with "the ever-evolving dictates of justice and fairness, which are the heart of our common-law tradition" (*Buckley v City of New York*, 56 NY2d 300, 305 [1982]).

Judges PIGOTT, FAHEY and GARCIA concur, Judge FAHEY in a separate concurring opinion; Judge RIVERA dissents in an opinion in which Judge ABDUS-SALAAM concurs; Chief Judge DIFIORE taking no part.

Following certification of a question by the United States Court of Appeals for the Second Circuit and acceptance of the question by this Court pursuant to section 500.27 of this Court's Rules of Practice, and after hearing argument by counsel for the parties and consideration of the briefs and record submitted, the certified question answered in the negative.